UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HENDERSON FORD                                        CIVIL ACTION

VERSUS                                                NO. 11-2950 c/w 12-422

MARLIN GUSMAN ET AL.                                  SECTION "C" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Henderson Ford, filed these two related complaints pro se, both pursuant to 42 U.S.C. § 1983, against Orleans Parish Criminal Sheriff Marlin Gusman, the Orleans Parish Criminal Sheriff's Department, the Orleans Parish Criminal Sheriff Medical Department and unnamed others. He complains about certain conditions of his confinement, including especially his medical care, during a three-month period of his incarceration in the Orleans Parish Prison ("OPP") at the end of 2011. His first complaint, Civil Action No. 11-2950, was filed while he was still incarcerated, but his in forma pauperis application was denied pursuant to 28 U.S.C. § 1915(g), so he paid the filing fee. He was permitted to file his second complaint in Civil Action No. 12-422 in forma pauperis because he was no longer a prisoner at the time he filed it, having been released from OPP, and Section 1915(g) applies only to prisoners. Ford seeks class action certification, injunctive relief and monetary damages.

On March 29, 2012, I conducted a telephone conference in this matter. Participating via telephone were plaintiff pro se and Tim Richardson, counsel for

defendants.  Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## THE RECORD

Ford's written submissions are voluminous, but his testimony confirmed, summarized and concisely organized his allegations. He confirmed that he asserts four kinds of claims in these cases relating to the conditions of his confinement in OPP; specifically, inadequate medical care, harassment and discrimination by another inmate, lack of access to adequate legal materials and assistance, and failure to provide adequate outdoor exercise.

Ford testified that he was incarcerated in OPP for about three months at the end of 2011, from September 22, 2011 through December 27, 2011 (as reflected in his medical records and prior written submissions).  He initially stated mistakenly that the period was August 2011 to January 2012.  He said that he was a pretrial detainee during his incarceration and was being held on charges of criminal damage to property, theft and possession of stolen property and burglary tools. He said he ultimately pled guilty to reduced misdemeanor charges and was no longer incarcerated at the time of the conference.  Ford stated that he was providing his testimony by telephone from his room in a hospital, where he was being treated for diabetes, specifically by having a toe amputated as a result of his worsening diabetes condition.

Plaintiff stated that he had not yet received a copy of his medical records, which were provided by defense counsel to the court. Record Doc. No. 33. As to his medical care claim, he testified that, upon his booking into OPP on September 22, 2011, he told the medical screener about his chronic diabetes, hepatitis C and HIV-positive conditions. He stated that, based upon those conditions, he was placed on the OPP medical tier, where he stayed for all of the three months of his confinement.

Ford complained that he "was not given medical meals for my diabetes." Specifically, he complained that, although the medical records reflect that he was supposed to be provided with food appropriate for diabetics, he received "the same food as the regular [prison] population." Ford said the regular meals have too much starch, which is bad for diabetics. He added that he was supposed to receive a "diabetic snack" in the evenings, which he was given, but he complained that he was supposed to have "one percent milk," but instead he received "two percent milk" or juice, which he was not supposed to have.

As to his diabetes medication, Ford confirmed the reference in the medical records that, while in OPP, he was given "the same thing" his primary care doctor was prescribing for him before he was incarcerated, a medication which the medical records

reflect was glipizide.[1]  He also confirmed the notation in the medical records that he was given "Accu-chek"[2] finger-prick blood testing of his blood sugar three times a week, as ordered by an OPP doctor, but he asserted that it should have been three times a day. Ford explained that he should have received the Accu-chek blood sugar test "three times a day before each meal," not just three times a week.  He stated that he was not provided with sufficient exercise opportunities, which he needed to help his diabetes.

Ford complained that he received no treatment for his hepatitis C while he was in OPP.  However, he admitted that he was <u>not</u> receiving any treatment for that condition <u>before</u> his incarceration, "because I had found out not too long ago that I had it while I was on the streets, and I was receiving no treatment for the hepatitis C, but I had an appointment to see a doctor about it."  He said he was told that he had hepatitis C by someone at a hospital a couple of months before he was arrested.

As to his HIV-positive condition, plaintiff confirmed the reference in his medical records that he was provided with various medications for that condition during his three months of incarceration in OPP.  He complained, however, that he was not provided "with the right type of medicine that my primary care doctor gives me."  He explained

---

[1]Glucotrol (generic name: glipizide) "is used along with diet and exercise to help lower high blood sugar in type 2 (non-insulin-dependent) diabetes."  <u>PDRhealth (Physicians' Desk Reference)</u> (PDR Network, LLC 2011), http://www.pdrhealth.com/drugs/glucotrol.

[2]Accu-Chek is a brand name for a blood sugar metering system. https://www.accu-chek.com (last visited Apr. 16, 2012).

that he was not given the right combination of medicines for his HIV-positive condition and that, "if you don't take all the medicine as a combo, it won't do no good."

Ford testified that his medical care claim also includes a complaint that, when he was released from jail, OPP medical officials did not give him a supply of any of the medications that he had been taking in jail, so that he could continue to take them after his release. He stated that he had experienced pain in his feet during his incarceration, but had received no pain medication. By comparison, he stated that, when he went to the hospital after his release, the doctor at the hospital gave him pain medication for his feet. Ford testified that, upon his release, he asked the OPP nurse to give him medications that he could take with him, but the nurse told him that OPP does not provide medical care or prescription drugs <u>after</u> a prisoner is released. According to his complaint in Civil Action No. 12-422, which was deemed filed on February 14, 2012, less than two months after he was released, Ford stated that he went to the hospital the same day that he was released, where he was seen by a doctor and given "pain medication for the pain in both of my legs because of my diabetes. The doctor gave me a month supply of pain pill[s]. The doctor also gave me some of my medication for my HIV. I have appointment to see my primary doctor on March 8, 2012." Civil Action No. 12-422, Record Doc. No. 1 at pp. 8-9.

Ford alleged that the inadequacies in the treatment he received for his diabetes while in OPP worsened his condition, leading to the present need, three months after his release, for amputation of one of his toes, which had become gangrenous. "This is the reason I'm in the hospital now," he stated. "I've been hospitalized twice . . . since I've been released." He said that he had been to the hospital about a month ago and was told that if he did not then receive attention, the toe would have to be amputated. He stated that he had pain in his feet and toes while he was in jail, but not gangrene, which did not begin until "about two or three days ago." He blamed his current condition, however, on the deficient treatment for his diabetes that he received in OPP. Ford said he was first diagnosed with diabetes about two years ago and was diagnosed as HIV-positive about 12 years ago. He said that he was not on insulin when he was in OPP, only medication, but that he is now on insulin "because my diabetes is all out of control right now."

Ford also complained that his medical care in OPP was deficient because the medical tier where he was housed was insufficiently staffed and was not equipped with a call system, so that if a prisoner in the medical tier needed a nurse or other attention, he would have to "beat on the wall to get in touch with these people." He also complained that prisoners with all kinds of different conditions, from mental illness to Crohn's disease, were all kept together in one place. He testified that no nurse was "on

duty 24 hours" on the medical tier, and that a nurse would come on the tier only when called or to deliver medications, including insulin for diabetics.

As to Ford's second claim, that he was harassed and discriminated against while in OPP, he alleged that another inmate knew what type of medication he was receiving and that "a lot of people don't want to associate with people" who are HIV-positive. Ford said that he and the other inmate argued and that he was threatened with being in fights because of the other inmate's discriminatory and belligerent attitude. He did not know the other inmate's name, "but I didn't get along with him."

As to his third claim that he was not provided with adequate legal materials and assistance while in OPP, Ford complained that the assigned legal assistant did not visit the prisoners and failed to respond to his requests for law books or other legal materials until Ford told the assistant that "he was denying me access to the courts." He complained that "years ago, when I was in jail, they had law books right in the tier," but during his recent incarceration he had to request copies of specific items from the legal assistant, who initially failed to bring him anything and later brought him only very limited legal materials, including a "few copies of cases out [of] the law books, . . . but it was totally inadequate." Asked why he needed legal materials, Ford testified that he needed them for the instant civil cases. He acknowledged that the OPP legal adviser had

provided him with the complaint forms he used to file these lawsuits. He complained that OPP has "only one legal adviser for the whole jail."

As to his fourth claim, Ford alleged that he did not receive sufficient outdoor exercise or fresh air during his three-month stay in OPP. He complained that he was taken outside for exercise only three times, which was once a month. Plaintiff testified that a person with diabetes needs exercise and fresh air, which can only be obtained outdoors. He conceded that he was able to exercise indoors, including doing pushups and sit-ups "probably every other day when I felt like doing it," but it was not the same as being outside. He said that each session lasted one hour on the three occasions when he was taken outdoors for exercise and that he "walked around the yard, ran in place, did what I could for the time being, but I didn't have too much strength because the diabetes weakened me, . . . so I mostly just walked around."

The medical records from OPP reveal that, during his medical intake screening on September 22, 2011, Ford reported that he had frontotemporal dementia, HIV and diabetes, but he did not mention hepatitis C. He stated that he had been taking Bactrim,[3]

---

[3]Bactrim (generic name: sulfamethoxazole) "is an antibiotic used to treat different types of bacterial infections . . . ." PDRhealth (Physicians' Desk Reference), http://www.pdrhealth.com/drugs/bactrim.

but that he had not taken any medication for diabetes for about two months prior to being jailed. His blood glucose level was 164.[4] Record Doc. No. 33 at pp. 5-8.

On the same date, after verifying with Ford's pharmacy the drugs that he had been taking before his incarceration, OPP Medical Director Samuel Gore, M.D., prescribed glipizide for Ford's diabetes and Bactrim, Truvada,[5] Reyataz,[6] azithromycin[7] and Norvir[8] for his HIV. Dr. Gore also ordered that plaintiff's blood sugar be checked with Accu-chek once a day, three times a week, for two weeks. Record Doc. No. 33 at pp. 20-22.

On September 26, 2011, Dr. Dileo saw Ford. Dr. Dileo diagnosed diabetes, hypertension and HIV, and continued the previously prescribed medications for his

---

[4]"The American Diabetes Association suggests the following targets for most nonpregnant adults with diabetes. . . . Preprandial plasma glucose (before a meal) 70-130 mg/dl . . . Postprandial plasma glucose (after a meal) <180 mg/dl . . . ." Checking Your Blood Glucose (American Diabetes Association 1995-2012) (footnote omitted), http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html (visited on Apr. 18, 2012).

[5]Truvada (generic name: emtricitabine and tenofovir disoproxil fumarate) "is indicated in combination with other antiretroviral agents for the treatment of HIV-1 infection in adults. Truvada combines two anti-HIV medications, Emtriva (emtricitabine 200 mg) and Viread (tenofovir disoproxil fumarate 300 mg), into one pill." Truvada (Gilead Sciences, Inc. 2011), http://www.truvada.com.

[6]Reyataz (generic name: atazanavir) "is used to treat people who are infected with the human immunodeficiency virus (HIV); it is used in combination with other anti-HIV drugs." PDRhealth (Physicians' Desk Reference), http://www.pdrhealth.com/drugs/reyataz.

[7]Zithromax (generic name: azithromycin) is an antibiotic that treats various bacterial infections. PDRhealth (Physicians' Desk Reference), http://www.pdrhealth.com/drugs/zithromax.

[8]Norvir (generic name: ritonavir) "is used in combination with other medicines to treat people with human immunodeficiency virus (HIV) infection (or AIDS)." PDRhealth (Physicians' Desk Reference), http://www.pdrhealth.com/drugs/norvir.

diabetes and HIV.  Record Doc. No. 33 at pp. 9-14.  On the same date, Dr. Gore ordered a "modified regular diet" for plaintiff with "no concentrated sugars" and an "evening snack with no added sugar," continuing until December 27, 2011.  Dr. Gore's order does not mention any specific foods to be included on the diet.  Record Doc. No. 33 at p. 25.

On November 9, 2011, a prison doctor saw Ford and diagnosed him with HIV, diabetes and (for the first time in the medical records) hepatitis C, for which plaintiff needed follow-up.  Record Doc. No. 33 at p. 19.  The doctor requested a consult with the LSU Health System Infectious Disease Clinic, noting that plaintiff had hepatitis C, diabetes and HIV; that he was being treated with glipizide (for diabetes) and Truvada, Reyataz, azithromycin, Bactrim and Norvir (for HIV); and that he needed a follow up visit with the clinic.  Record Doc. No. 33 at p. 29.

The same physician also completed a Diabetic Chronic Care Treatment Plan on November 9, 2011.  The doctor noted that Ford was taking glipizide, that he reported medical and dietary compliance, and that he had no new symptoms, no edema or lesions in his lower extremities, and normal pulses in both lower extremities.  Ford's glucose control was described as "good," with blood glucose levels ranging from 144 to 158.  His complication control was considered adequate and his condition was improved.  Plaintiff was counseled about the need to comply with his diet, routine exercise, smoking cessation, weight loss and foot monitoring.  The doctor continued the order for Accu-

chek testing three times per week for 90 days. Lab tests were also ordered, as per instructions from the Infectious Disease Clinic. Record Doc. No. 33 at p. 18.

Another order was entered on December 5, 2011 to continue Ford's modified regular diet with no concentrated sugars and an evening snack with no added sugar from December 27, 2011 through March 27, 2011. Record Doc. No. 33 at p. 24.

C.L. Besch, a health care provider at the LSU Infectious Disease Clinic, stated in a telemedicine report on December 14, 2011 that plaintiff had not been seen at the clinic because of an electrical outage at OPP, but that Ford had been seen at the same clinic on September 8, 2011 (before his incarceration). Besch noted that Ford needed new lab work. Besch stated that plaintiff's "diabetes was very out of control," with blood sugar levels of 300-400, and recommended that Ford's glipizide be adjusted or other agents added as needed for his diabetes. Besch opined that the combination of "Truvada, Reyataz and Norvir should work" for plaintiff's HIV. A notation on the form in a different handwriting, which appears to have been made at OPP, states that plaintiff's diabetes was "controlled in Nov[ember]. Will set up reeval[uation]." Record Doc. No. 33 at p. 28.

On December 19, 2011, Dr. Gore noted that Ford needed lab tests for HIV and a diabetes re-evaluation within two weeks because his blood sugars had been high on non-

fasting lab tests, as reflected on the December 14th telemedicine form.  Record Doc. No. 33 at p. 16.

Blood tests were performed on December 21 and a report was printed on December 23, 2011.  Record Doc. No. 33 at pp. 26-27.  There are no further medical records.  According to his testimony and written submissions, Ford was released from OPP four days later, on December 27, 2011.

## **ANALYSIS**

### I.    STANDARDS OF REVIEW

Two separate but similar screening standards apply to Ford's complaints.  His first suit was filed pro se but <u>not</u> in forma pauperis while he <u>was</u> a prisoner.  In these circumstances, 42 U.S.C. § 1997e(c)(1) provides:  "The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . if the court is satisfied that the action is frivolous, malicious, [or] fails to state a claim upon which relief can be granted . . . ."  Ford's second suit, filed when he was <u>no</u> <u>longer</u> a prisoner, was filed in forma pauperis, and is therefore subject to 28 U.S.C. § 1915(e)(2), which similarly requires dismissal of any frivolous claim or action that fails to state a claim, regardless whether the plaintiff is a prisoner.

A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

Both of Ford's lawsuits have been filed pro se. The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180. "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a <u>Spears</u> hearing." <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."  <u>Id.</u> at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest

which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269. If Ford's complaints fail to state a claim, either may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) as to the in forma pauperis complaint and 42 U.S.C. § 1997e(c)(1) as to the complaint he filed as a prisoner, even though he paid the filing fee.

In this case, plaintiff's complaints may be dismissed under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), either as legally frivolous because they lack an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaints, as amended by his testimony at the Spears hearing, fail to state a claim under the broadest reading.[9]

II.     MEDICAL CARE

Ford was a pretrial detainee awaiting trial on various charges at all relevant times about which he complains. Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial

---

[9]Pro se civil rights complaints must be broadly construed, Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994), and I have broadly construed the complaint in this case.

detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest. Bell v. Wolfish, 441 U.S. 520, 539 (1979); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992). The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

In Hare, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id.

16

at 645. If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply. Id.

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Hare, 74 F.3d at 650. "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). The Farmer definition applies to Eighth Amendment medical claims. Reeves, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834 (quotation omitted). Thus, plaintiff must show deliberate indifference to his "serious medical

needs" to satisfy this prong.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id.</u> at 837.  If the court finds that one of the components of the test is not met, it need not address the other component.  <u>Davis</u>, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997) . . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

<u>Southard v. Tex. Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (citations omitted) (emphasis added).  "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton</u>, 122 F.3d at 291.

In the instant case, plaintiff's pleadings as expanded by his testimony establish that nothing more than episodic acts or omissions as defined in <u>Hare</u> are at issue in this case.  Thus, the "deliberate indifference" standard applies and plaintiff must allege facts

sufficient to establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, Ford fails to allege facts sufficient to satisfy the stringent "deliberate indifference" standard.

Ford's testimony and medical records negate any inference that defendants acted with deliberate indifference to his serious medical needs with regard to the treatment he received while incarcerated at OPP. Initially, it cannot be concluded that the conditions he described presented serious medical needs that posed a substantial risk of harm <u>during his incarceration</u> at the jail. Ford's testimony about his diabetes, hepatitis C and HIV-positive conditions did not identify any serious risk of harm or any actual serious harm resulting from the alleged denial of treatment at OPP sufficient to rise to the level of serious medical needs for purposes of constitutional analysis. At most, he suffered, for only three months, a non-diabetic diet, blood sugar testing three times a week instead of daily and a different prescription drug regimen for his HIV than he had previously received. Although he testified that the medical tier where he was housed did not have a call system, he has not alleged any serious risk of harm or actual harm resulting from that lack.

Plaintiff's allegation that he should have received pain medication because he was experiencing pain in his feet during his incarceration is unsupported by any medical

records or even his own testimony.  According to the medical records, Ford made only one sick call request on October 15, 2011, which concerned a spider bite or "blood clot" on his left leg.  He was examined by a nurse, who found a "small bump" on his left calf with no redness or drainage.  Record Doc. No. 33 at p. 15.  Ford also complained of "lumps" on his left calf during physical examination by a physician on November 25, 2011.  The doctor's examination revealed superficial varicosities[10] on plaintiff's leg, without any clots, edema, dermatitis or increased pigmentation rash.  The doctor ordered that plaintiff receive compression stockings to decrease the risk of deep vein thrombosis.  Record Doc. No. 33 at p. 17.  None of the other medical records reflect any complaints of pain in his feet and Ford did <u>not</u> testify that he had complained of pain in his feet to anyone at the jail.  In the absence of any complaint or sick call request to prison officials regarding pain in his feet, Ford has not alleged a serious medical need and prison officials could neither know of nor disregard an excessive risk to his health related to such pain.

Ford alleges that he received no treatment for hepatitis C while in OPP, but he admittedly had not received any treatment for this condition before his incarceration.  A diagnosed condition for which plaintiff does not require medical treatment is not a serious medical need.  <u>Johnson v. Kelly</u>, 184 F. App'x 427, 429 (5th Cir. 2006);

---

[10]Varicosities are enlarged and tortuous veins, arteries or lymphatic vessels.  <u>Stedman's Medical Dictionary</u> (27th ed.), avail. on Westlaw at STEDMANS 431920.

Etheridge v. Helton, No. 1:09-0067, 2011 WL 1627976, at *5 (M.D. Tenn. Apr. 29, 2011), report & recommendation adopted, 2011 WL 2078564 (M.D. Tenn. May 26, 2011).  Various courts have found that chronic, asymptomatic hepatitis C, such as Ford had, is a non-serious medical condition for purposes of Section 1983 analysis.  Holt v. Enenmoh, No. 1:10-cv-02385-SKO, 2012 WL 14025, at *3 (E.D. Cal. Jan. 4, 2012) (citing Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000)); Moore v. Bennett, 777 F. Supp. 2d 969, 980 (E.D.N.C. 2011), aff'd, 446 F. App'x  579 (4th Cir. 2011); Gray v. Hernandez, No. 08-1147-JM, 2010 WL 6230519, at *5 (S.D. Cal. Nov. 30, 2010), report & recommendation adopted as modified on other grounds, 2011 WL 1043619 (S.D. Cal. Mar. 22, 2011).

Even assuming, without concluding, that plaintiff's medical conditions were serious conditions for constitutional purposes, he has alleged facts, confirmed by the medical records, that negate any inference of deliberate indifference by jail officials. Plaintiff's complaints as amended by his testimony and medical records, show that he received constitutionally adequate medical care for his diabetes, hepatitis C and HIV-positive conditions while incarcerated at OPP.  His extensive medical treatment included housing on a medical tier, physical examinations, prescription medications, regular Accu-check monitoring, laboratory tests, a referral to the LSU Infectious Disease Clinic and continuous orders for a modified regular diet with no concentrated sugars and an evening

snack with no added sugar. Plaintiff admits that he received an evening snack. Nothing in the medical orders indicates that he should have been provided with one percent milk.

Although he complains that he received no treatment for hepatitis C, the medical records reflect that prison doctors diagnosed plaintiff with hepatitis C and ordered blood tests to monitor his health. See Concepcion v. Pickles, 450 F. App'x 72, 74 (2d Cir. 2011) (failure to provide medication for more than one year to prisoner with HIV was not deliberate indifference when his blood count was consistently monitored and treatment began promptly when his blood count fell below a certain level); Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 504 (1st Cir. 2011) (regional medical director of prisons was not deliberately indifferent to HIV-positive inmate's complaint that he had not received any medication, when director investigated and found that plaintiff had recently been seen by clinic providers, his blood had been drawn for lab tests and he had a followup appointment with HIV specialty clinic); Brightwell v. Lehman, 637 F.3d 187, 194 (3d Cir. 2011) (prison official's failure to provide diabetic diet to diabetic inmate was not deliberate indifference when inmate "received appropriate accommodations and regular medical screenings"); Radunz v. Muhlhausen, 375 F. App'x 618, 620-21(7th Cir. 2010) (no deliberate indifference when inmate received regular medication, blood-sugar checks and special diet for diabetes); Cody v. CBM Corr. Food Servs., 250 F. App'x 763, 765 (8th Cir. 2007) (summary judgment was proper on inmate's claim that defendant failed

to provide him with a special diabetic diet, as ordered by the doctor, when inmate presented no evidence of immediate danger to his health or that his health suffered due to failure to provide prescribed diet); <u>Greer v. Tran</u>, 124 F. App'x 261, 262 (5th Cir. 2005) (although prisoner ultimately died after falling into a diabetic coma, there was no deliberate indifference to his serious medical needs when he was tested for and diabetes mellitus was ruled out); <u>Harris v. Donaldson</u>, 71 F.3d 876, 1995 WL 725438, at *2 (5th Cir. Nov. 3, 1995) (no deliberate indifference when prisoner received medical treatment for diabetes, including blood sugar level monitoring, insulin doses and other attention, rendering his Section 1983 medical care claim merely a "quarrel with the quality and quantity of his medical treatment" for diabetes).

While it is clear from plaintiff's allegations and testimony that he is not satisfied with the quality or effectiveness of his medical care, it is equally clear that the medical care provided was substantial, reasonable and constitutionally adequate. His own testimony confirmed the ample documentation in the medical records that he was seen by doctors at OPP and that he received Accu-chek monitoring of his blood sugar, a daily evening snack as ordered and prescription medications for his diabetes and HIV. The medical records are replete with references to the treatment he received for his conditions, including physical examinations, lab tests, special diet orders and a referral to the LSU Infectious Disease Clinic. The medical records indicate that Ford's blood

glucose levels were generally under control while he was incarcerated in OPP and that the combination of medications prescribed for his HIV was medically appropriate. Certainly, no finding of deliberate indifference to serious medical needs in the constitutional sense can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (footnotes, citations and internal quotations omitted). No such showing has been made on the current record.

Contentions like Ford's that amount to a mere disagreement with the quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Sims v. Dretke, 212 F. App'x 276, 277 (5th Cir. 2006) (citing Banuelos, 41 F.3d at 235; Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991)) ("[T]he United States Department of Health

and Human Services has stated [that] an HIV-positive individual need not necessarily undergo anti-HIV treatment; whether to undergo such treatment depends on an individual's medical assessments and particular circumstances.  [Plaintiff] admits being medically examined on numerous occasions, but disagrees with his diagnosis and course of treatment.  Such disagreement, standing alone, is insufficient to state a claim under § 1983."); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (allegations establishing provision of medical treatment found inconsistent with inference of deliberate indifference); Davis v. Ramen, No. 1:06-cv-01216-AWI-SMS, 2011 WL 2313653, at *12 (E.D. Cal. June 9, 2011) (citing Franklin v. Oregon, 662 F.2d 1337, 1355 (9th Cir. 1981)) (When inmate's diabetes and HIV were routinely monitored, well maintained and under control, his disagreement with the course of the medical treatment provided "does not support a claim of deliberate indifference as his lay opinion is insufficient to overcome the opinion of his treating physicians with regard to his course of treatment.").

Ford further alleges that OPP officials were deliberately indifferent to his serious medical needs when, upon his release from jail, they did not give him a supply of any of the medications that he had been taking in jail, so that he could continue to take them after his release.  Ford testified that, upon his release, he asked the nurse to give him

25

medications to take with him, but was told that OPP does not provide medical care or prescription drugs after a prisoner is released.

Ford again fails to allege facts sufficient to satisfy the stringent deliberate indifference standard with regard to prison officials' failure to provide him with any medication upon his release from OPP. First, as discussed above, the conditions that plaintiff described did not present serious medical needs that posed a substantial risk of harm to him during the period immediately following his release. In the absence of a serious medical need, defendants could not be found liable for deliberate indifference.

Second, although the Constitution imposes a duty on prison officials to provide medical care to an inmate <u>during his incarceration</u>, neither the United States Supreme Court nor the Fifth Circuit Court of Appeals has held that such a constitutional duty exists <u>after</u> the inmate has been released from jail.

> The government's obligation to provide medical services <u>to incarcerated individuals</u> established in <u>Estelle</u> is an exception to the general rule that the Due Process Clause does not generally place affirmative duties on the state. <u>See</u> <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). In <u>DeShaney</u>, the Court addressed the state's duty to a child who had notified state officials of his father's abuse. In rejecting the child's argument that an affirmative duty to protect existed, the Court examined and explained the <u>Estelle</u> holding:
>> [W]hen the State takes a person into <u>its custody and holds him there</u> against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so <u>restrains an individual's liberty that it renders</u>

> him unable to care for himself, and at the same time fails to
> provide for his basic human needs–e.g., food, clothing,
> shelter, medical care, and reasonable safety–it transgresses
> the substantive limits on state action set by the Eighth
> Amendment and the Due Process Clause. The affirmative
> duty to protect arises not from the State's knowledge of the
> individual's predicament or from its expressions of intent to
> help him, but from the limitation which it has imposed on his
> freedom to act on his own behalf.

Lugo v. Senkowski, 114 F. Supp. 2d 111, 114 (N.D.N.Y. 2000) (quoting DeShaney, 489

U.S. at 199-200) (citing Estelle, 429 U.S. at 103-05) (emphasis added).

Only one federal appellate court has found that a prison official has an affirmative

duty to provide medication to a prisoner upon his release. The Ninth Circuit in

Wakefield v. Thompson, 177 F.3d 1160 (9th Cir. 1999), expanded the rationales of

Estelle and DeShaney by holding that "common sense" indicates that "a prisoner's ability

to secure medication 'on his own behalf' is not necessarily restored the instant he walks

through the prison gates and into the civilian world." Id. at 1164 (quoting DeShaney,

489 U.S. at 200). The appeals court therefore held that

> the period of time during which prisoners are unable to secure medication
> "on their own behalf" may extend beyond the period of actual
> incarceration. Under the reasoning of Estelle and DeShaney, the state's
> responsibility to provide a temporary supply of medication to prisoners in
> such cases extends beyond that period as well.
>
> We therefore hold that the state must provide an outgoing prisoner
> who is receiving and continues to require medication with a supply
> sufficient to ensure that he has that medication available during the period
> of time reasonably necessary to permit him to consult a doctor and obtain
> a new supply. A state's failure to provide medication sufficient to cover

this transitional period amounts to an abdication of its responsibility to provide medical care to those, who by reason of incarceration, are unable to provide for their own medical needs.

Id.

Wakefield is not binding precedent in the Fifth Circuit, which, like the other circuits outside the Ninth Circuit, has never recognized a duty on the part of jail officials to provide prescription medications or other types of medical care after an inmate's release. Its reliance on non-evidentiary "common sense" is directly contrary to Ford's own testimony that he in fact has been able to receive treatment for his chronic conditions on his own both immediately before and immediately after his incarceration.

In Carlson v. Holton, 243 F. App'x 49 (5th Cir. 2007), the Fifth Circuit assumed solely for the sake of argument that the defendants, a parole officer, the director of a halfway house and the director of the parole division of the Texas Department of Criminal Justice, might have a constitutional duty to plaintiff, a former prisoner, who alleged that defendants violated his constitutional rights while he was on parole and living in a halfway house. "Assuming, arguendo only, that the State had a duty to assume responsibility for Carlson's safety and well-being while he was living in the halfway house, Carlson must still show that the named defendants were deliberately indifferent to an excessive risk of harm to his health and safety," but plaintiff was unable to show any excessive risk of harm from the conditions in the halfway house about which

he complained.  Id. at 50 (citing Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005));

see Jacobs, 400 F.3d at 106 (quoting DeShaney, 489 U.S. at 200) (Paroled plaintiff stated

a claim against defendant parole officers that "his placement in an allegedly

uninhabitable home violated the state's affirmative duty to 'assume some responsibility

for his safety and general well-being' while he remained under its supervision and

subject to the restrictions of parole. . . .  A parolee, although not in the state's physical

custody, is nonetheless in its legal custody, and his or her freedom of movement, while

not as restricted as that of an incarcerated prisoner, is nonetheless somewhat

curtailed. . . .  Accordingly, because the limitations imposed by the state are minimal, so

too are the duties it assumes.").   In the instant case, Ford was a pretrial detainee at OPP

and is suing the Sheriff who administers the jail and the OPP medical department; he was

not a parolee who was under continued legal supervision and is suing his parole officers

over post-release conditions.

The Ninth Circuit's Wakefield decision is distinguishable on the facts from the

instant case.  In Wakefield, the inmate suffered from organic delusional disorder, which,

when untreated, rendered him "prone to violent outbursts." Wakefield, 177 F.3d at 1162.

To manage his disorder while in prison, Wakefield took Navane, a psychotropic

medication that was prescribed by the prison psychiatrist.

> According to Wakefield's allegations, he met with Dr. Dupre shortly
> before he was released from San Quentin.  At this time, the doctor wrote

> Wakefield a prescription for two-weeks worth of Navane to be filled by prison officials and dispensed upon Wakefield's release from prison. On the day of his release, Wakefield asked [defendant] John Doe, the officer handling the release procedure, for his two-week supply of Navane. Doe replied that "there wasn't any medication available." Despite Wakefield's protestations that the medicine had been prescribed and that without the medicine he would suffer a relapse of his mental disorder, Doe refused even to call the prison medical staff to check on Wakefield's prescription. Doe's only explanation for his actions was that the prison was "late paroling," in other words, that he was too busy.
>
> Wakefield was, accordingly, released from San Quentin prison without the medication necessary to control his mental disorder. According to his allegations, eleven days after his release he suffered a relapse. The relapse led to a violent outburst and to Wakefield's subsequent arrest.

Id. (emphasis added).

Unlike Ford in the instant case, who has not alleged facts that demonstrate any serious medical need, the court in Wakefield assumed that the plaintiff had a serious medical need, based on his allegations that the prison doctor had prescribed a two-week supply of psychotropic medication for the period after he was released from incarceration, that he suffered violent outbursts without it and that he suffered such an outburst only eleven days after his release without any medication. The Ninth Circuit found that Wakefield had sufficiently alleged a claim that John Doe's failure to follow the medication orders of plaintiff's treating psychiatrist constituted deliberate indifference to a serious medical need. Id. at 1165.

District courts in the Ninth Circuit have followed Wakefield, as have a few others outside the Ninth Circuit. In Goldstein v. Sillen, No. C 07-5958, 2011 WL 4725839

(N.D. Cal. Sept. 30, 2011), the prison doctor prescribed a supply of pain medication to be provided to the inmate, Goldstein, upon his release. However, the medication was not available on the day of his release. Jail officials told plaintiff that he could wait two days to be released and obtain his medication then, but he chose to be released without the medication on the scheduled day. Goldstein admitted that he went to a hospital on the day of his release and obtained his medications that day. Id. at *4, *9.

Citing Wakefield, the California district court held that the State's "obligation to provide constitutionally adequate medical care does not end at the prison gate." Id. at *19. However, the court found that the "slight delay" in provision of plaintiff's medication was not deliberately indifferent and did not amount to unconstitutional denial of medical care, when plaintiff suffered no injury because he was able to obtain his medications from a hospital the same day. Id. at *20; cf. Griffith v. Hofmann, No. 2:05-CV-126, 2006 WL 2585074, at *3-4 (D. Vt. Aug. 24, 2006) (citing Wakefield, 177 F.3d at 1164; Lugo, 114 F. Supp. 2d at 114) (inmate who suffered from "manic depression" and was not given any medication upon his release, which allegedly led to an abrupt drug withdrawal that left him "unstable," stated a claim for deliberate indifference, when prison had "a practice of providing inmates who are released on supervisory status with a five-day supply of medications"); Lugo, 114 F. Supp. 2d at 114-15 (citing Wakefield, 177 F.3d at 1164) (The State has a duty to provide medical services for an outgoing

prisoner who is "receiving continuing treatment" at the time of his release for the period of time "reasonably necessary" for him to obtain treatment on his own behalf. Plaintiff had surgery shortly before he was released from prison. He was told by his treating physician that he would need followup surgery within several weeks, was released before any followup surgery was done, and entered the hospital on an emergency basis five days after his release. "In other words, Plaintiff was released in the midst of an ongoing surgical process, at approximately the time that the second leg of the procedure was to be completed. . . . Defendants allegedly provided Plaintiff no assistance in obtaining the medical treatment he needed. . . . Just as in Wakefield, Plaintiff was undergoing continuing treatment at the time he was released, was in need of medical aid in the period immediately following that release and was denied that aid." Under these circumstances, plaintiff "was owed a limited duty of protection beyond his period of incarceration which was not satisfied by the state.").

In the instant case, Ford has not alleged facts that would establish a serious medical need for continued medications from OPP upon his release. Unlike the cases cited above in which the courts found that prisoners stated a cause of action when jail officials had denied them medications upon their release, which had been prescribed specifically for the post-release time period, no physician at OPP prescribed any such post-release medications for Ford. It also is clear from his testimony and the medical

records that care was readily available to him both immediately before and immediately after his incarceration.  In short, <u>Wakefield</u> and its progeny are <u>not</u> the law of the Fifth Circuit, and I see no reason to extend it to Ford in this case.

Even if the <u>Wakefield</u> ruling were applicable in this court, Ford has not alleged any substantial risk of or actual harm from OPP's failure to provide him with medications "during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply." <u>Wakefield</u>, 177 F.3d at 1162.  Like the plaintiff in <u>Goldstein</u>, Ford went to the hospital the same day that he was released, where he was seen by a doctor and given medication for his HIV and a month's supply of pain medication.  As in <u>Goldstein</u>, even under the <u>Wakefield</u> standard, Ford "suffered no harm during the brief period that he lacked [medications]" and cannot state a claim for deliberate indifference to a substantial risk of serious harm.  <u>Goldstein</u>, 2011 WL 4725839 at *20.

For all of the foregoing reasons, plaintiff's complaints in this case about his medical care advance a legally frivolous argument and fail to state a claim upon which relief may be granted under Section 1983.

III.    HARASSMENT/DISCRIMINATION BY A FELLOW INMATE

Plaintiff claims that he was harassed and discriminated against while in OPP by another inmate who knew what type of medication he was receiving and that "a lot of people don't want to associate with people" who are HIV-positive. Ford said that he and the other inmate argued and that he was threatened with being in fights with the other inmate because of the other inmate's discriminatory and belligerent attitude.

To the extent that Ford is naming the other inmate as a defendant, his allegations that the other inmate verbally threatened him or made other derogatory remarks to him are not cognizable under Section 1983. Verbal threats by prison staff or other offenders, including verbal harassment based on an inmate's HIV-positive status, do not rise to the level of a constitutional violation. Field v. Corr. Corp., 364 F. App'x 927, 930 (5th Cir. 2010) (citing Robertson v. Plano City, 70 F.3d 21, 24 (5th Cir. 1995)); Matthews v. Graham, 235 F.3d 1339, 2000 WL 1672660, at *1 (5th Cir. 2000) (citing McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983)).

"Claims of hurt feelings, humiliation, and other heartfelt, yet objectively trivial indignities, are not of Constitutional moment . . . ." Jackson v. Liberty County, 860 F. Supp. 360, 363 (E.D. Tex. 1994). "Verbal harassment and abusive language, while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." Slagel v. Shell Oil Ref., 811 F. Supp. 378, 382 (C.D. Ill.

1993), aff'd, 23 F.3d 410 (7th Cir. 1994). In this case, plaintiff's allegations of verbal abuse by a fellow inmate do not rise to the level of a constitutional violation, and these allegations fail to state a claim upon which relief may be granted.

In addition, to be successful under Section 1983, a plaintiff must establish that the defendant has acted under color of state law in violating his rights. Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). Action taken under color of state law for purposes of Section 1983 requires a defendant's use of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law" and when the defendant is engaged in the "performance of official duties." United States v. Causey, 185 F.3d 407, 415 (5th Cir. 1999). To state a claim under Section 1983, a plaintiff must show "(1) deprivation of a right, privilege or immunity secured by the federal laws or Constitution (2) by one acting under color of state law." Miss. Women's Med. Clinic v. McMillan, 866 F.2d 788, 791 (5th Cir. 1989) (emphasis added); Morris v. Dearborne, 181 F.3d 657, 666 n.6 (5th Cir. 1999). Plaintiff must show that defendant's actions are "fairly attributable to the state." West v. Atkins, 487 U.S. 42, 49 (1988).

Under no circumstances can the threatening fellow inmate, whom Ford was unable even to name, be considered a state actor. Polk County v. Dodson, 454 U.S. 312, 325 (1981); Hudson v. Hughes, 98 F.3d 868, 873 (5th Cir. 1996); Mills v. Crim. Dist. Ct.

<u>No. 3</u>, 837 F.2d 677, 679 (5th Cir. 1988). The inmate's actions upon which plaintiff bases his claims were clearly taken as a private person, not in any official capacity authorized by the State. Prison officials in no way can be responsible for these attitudes and actions by an inmate. Because the inmate is not a state actor, plaintiff's Section 1983 claim against this defendant has no basis in federal law and must be dismissed for failure to state a cognizable claim.

IV.   <u>ACCESS TO LEGAL MATERIALS</u>

Plaintiff testified that he was not provided with adequate legal materials and assistance while in OPP. Prisoners have a First Amendment right of meaningful access to the courts through adequate law libraries or assistance from legally trained personnel. <u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1977); <u>Dickinson v. TX, Fort Bend County</u>, 325 F. App'x 389, 390 (5th Cir. 2009); <u>Sandoval v. Johns</u>, 264 F.3d 1142, 2001 WL 822779, at *1 (5th Cir. 2001); <u>McDonald v. Steward</u>, 132 F.3d 225, 230 (5th Cir. 1998); <u>Degrate v. Godwin</u>, 84 F.3d 768, 768-69 (5th Cir. 1996). However, a prison need not provide its inmates with a library that results in the best possible access to the courts, but must provide a library or other assistance that meets minimum constitutional standards of providing access to the courts. <u>Petrick v. Maynard</u>, 11 F.3d 991, 994 (10th Cir. 1993); <u>Johnson v. Moore</u>, 948 F.2d 517, 521 (9th Cir. 1991); <u>Hargrove v. Henderson</u>, No. 95-1601-CIV-T-17A, 1996 WL 467516, at *10 (M.D. Fla. Aug. 13, 1996), <u>aff'd</u>, 124 F.3d

221 (11th Cir. 1997); <u>U.S. v. Janis</u>, 820 F. Supp. 512, 515-16 (S.D. Cal. 1992), <u>aff'd</u>, 46 F.3d 1147 (9th Cir. 1995).

"While the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has <u>not</u> extended this right to encompass more than <u>the ability of an inmate to prepare and transmit a necessary legal document to a court</u>." <u>Vaccaro v. United States</u>, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); <u>accord</u> <u>Norton</u>, 122 F.3d at 290; <u>Eason v. Thaler</u>, 73 F.3d 1322, 1328 (5th Cir. 1996).

Significantly, to state a claim that his constitutional right of access to the courts was violated, Ford must demonstrate that his position as a litigant was actually prejudiced. <u>Lewis v. Casey</u>, 518 U.S. 343, 356 (1996); <u>Cochran v. Baldwin</u>, 196 F. App'x 256, 257-58 (5th Cir. 2006); <u>Smith v. Polunsky</u>, 233 F.3d 575, 2000 WL 1468717, at *1 (5th Cir. 2000); <u>Eason</u>, 73 F.3d at 1328. The inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." <u>Lewis</u>, 518 U.S. at 351.

Ford wholly fails to establish the essential elements of a First Amendment claim detailed above, either in his complaint or his testimony. His testimony establishes that he has been provided with and has in fact had the ability to prepare and transmit legal documents to the courts, including his complaints and voluminous additional

submissions in these cases. In addition, no actual prejudice to his position as a litigant has occurred.

It is clear that no actual legal prejudice to Ford's position as a litigant of the type required by Lewis was caused by any action or omission of the defendants. "[C]ausation is an element of a section 1983 claim; [defendants'] actions must have actually caused the deprivation . . . of which [plaintiff] complains." Hart v. O'Brien, 127 F.3d 424, 446 (5th Cir. 1997), abrogated in part on other grounds as recognized in Spivey v. Robertson, 197 F.3d 772 (5th Cir. 1999); accord Brown v. Bryan County, 219 F.3d 450, 457 (5th Cir. 2000). In Lewis, the Supreme Court made clear that an inmate must establish actual injury to state a claim for denial of his right of access to the courts.

Ford acknowledged in his testimony that OPP had a system by which he could request copies of specific items from the legal assistant and that the OPP legal assistant provided him with copies of some of the legal materials he had requested and with the complaint forms that he used to file these lawsuits. The court has received and considered all of plaintiff's submissions. He has neither alleged nor shown any actual injury to his position as a litigant in these matters.

For all of the forgoing reasons, Ford's claim concerning inadequate access to a law library at OPP is legally frivolous and fails to state a claim upon which relief can be granted under Section 1983.

V.    OUTDOOR EXERCISE

Ford alleges that he did not receive sufficient outdoor exercise or fresh air during his three-month stay in OPP.  He complained that he was taken outside for exercise only three times, which was once a month, for an hour each time.  He conceded that he was able to exercise indoors every other day.

The Fifth Circuit "has held that deprivation of exercise may constitute an impairment of health, which is actionable under the Eighth Amendment, and that the absence of outdoor exercise opportunities may constitute an Eighth Amendment violation."  Hewitt v. Henderson, 271 F. App'x 426, 428 (5th Cir. 2008) (citations omitted).  "While neither the Fifth Circuit nor the United States Supreme Court has ever specifically held that inmates enjoy an absolute right to out-of-cell exercise, the Fifth Circuit has repeatedly held that an extended deprivation of exercise opportunities might impinge upon an inmate's Eighth Amendment rights depending upon the particular facts of a given case."  Doolittle v. Holmes, No. 06-986-C, 2010 WL 22552, at *4 (M.D. La. Jan. 4, 2010) (citing Hewitt, 271 F. App'x at 428; Green v. Ferrell, 801 F.2d 765 (5th Cir. 1986); McGruder v. Phelps, 609 F.2d 1023 (5th Cir. 1979)) (emphasis in original).

However, it is clear that inmates have no protected liberty interest in specific recreational opportunities.  Lato v. Attorney Gen., 773 F. Supp. 973, 978 (W.D. Tex. 1991) (citing Beck v. Lynaugh, 842 F.2d 757, 762 (5th Cir. 1988)).  To succeed on a

claim under Section 1983 for lack of exercise, a prisoner must establish "the existence of any health hazard under the specific circumstances involved."  Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir.), amended in part, vacated in part on other grounds, 688 F.2d 266 (5th Cir. 1982); accord Delaney v. DeTella, 256 F.3d 679, 684 (7th Cir. 2001); Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986).

Plaintiff must also allege an actual injury caused by defendants' acts.  See Lawson v. Stevens, 62 F.3d 394, 1995 WL 450100, at *1 (5th Cir. 1995) (citing Knight v. Caldwell, 970 F.2d 1430, 1432 (5th Cir. 1992)) (prisoner who "concedes that he was not harmed by the leg irons" with which he was shackled failed to state Eighth Amendment violation); Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993) (excessive force claim dismissed as frivolous when prisoner suffered no injury); Oliver v. Collins, 904 F.2d 278, 281 (5th Cir. 1990) (dismissal was proper when plaintiff alleged insufficient causal connection between defendants' conduct and the claimed assault, and plaintiff did not allege constitutional harm); Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 602 (5th Cir. 1988) (Section 1983 is designed to compensate persons for actual injuries caused by deprivation of constitutional rights); Jefferson v. City of Hazelhurst, 936 F. Supp. 382, 386 (S.D. Miss. 1995) ("To state a cause of action under Title 42 U.S.C. § 1983, the plaintiff must plead . . . that there exists a direct causal connection, . . . without intervening factors, between the deprivation and some injury to plaintiff.").

Plaintiff has failed to establish any constitutional violation related to his exercise opportunities. First, he admittedly was given time for both indoor and outdoor exercise while in OPP, although he did not have as much opportunity for outdoor exercise as he would have preferred. Second, he has not presented any evidence that the lack of outdoor exercise more than once per month caused any serious health hazard. He merely speculates that, as a diabetic, he would have benefitted from more fresh air and outdoor exercise, as opposed to indoor exercise. This speculation is insufficient to establish either a substantial risk of serious harm or any actual injury. See Haralson v. Campuzano, 356 F. App'x 692, 697 (5th Cir. 2009) (inmate who was denied out-of-cell exercise for seven months while in the prison infirmary failed to raise a genuine issue of material fact as to whether he suffered a serious injury sufficient to constitute an Eighth Amendment violation); Hernandez v. Velasquez, 522 F.3d 556, 561 (5th Cir. 2008) (Assuming the evidence created a fact issue whether plaintiff suffered from muscle atrophy, stiffness, loss of range of motion, and depression as a result of lack of out-of-cell exercise for 13 months, "there is nonetheless no indication these conditions posed a substantial risk of serious harm. The district court properly concluded there was no genuine issue as to whether Hernandez suffered a 'serious illness or injury' sufficient to constitute an Eighth Amendment violation."); Doolittle, 2010 WL 22552, at *6 ("[A]lthough the plaintiff alleged in his Complaint that he suffered muscle atrophy as a

result of his confinement for 2 1/2 months without exercise, there is no evidence to support this conclusory assertion. The plaintiff has provided nothing to support his claim of muscle atrophy or to show its extent or duration," and his medical records revealed no complaints about muscle atrophy during the relevant time period.).

Plaintiff has neither established that he was actually deprived of outdoor recreation nor that he suffered any physical injury or violation of his constitutional rights of any kind as a result of his alleged lack of outdoor exercise.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaints be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under Fed. R. Civ. P. 12(b)(6), 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), as applicable.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v.</u>

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[11]

New Orleans, Louisiana, this ___11th___ day of May, 2012.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[11]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.